Please be seated, please. All right, the next case we're going to hear is Fidelity and Guaranty Life v. Quintero. Good morning, Your Honors. May it please the Court? My name is Scott Swofford. I'm representing both Quintero, which is a trade name for United Advisory Group, as well as the individual defendant, Mr. Resettles. This case involves what we're going to call three areas of substantive law and three fundamental questions. One deals with the interplay between unjust enrichment as an available restitution measure in cases where there's an express contract. And the second deals with the judge's role as gatekeeper under Rule 50A for preventing items from going through to the jury. And the third is whether any of the other errors or alleged errors of the trial court contributed to the overall verdict and changed your stand on the review. So on the first issue, as a basic measure, we're going to suggest that it's not very controversial in the law, that where an express contract exists and governs the scope of performance between parties, unjust enrichment is not available. The Supreme Court has mentioned this. It's a longstanding tenet of Maryland law. It's reflected in the Fourth Circuit. I don't think that's the issue. Under Maryland law as well, which is applicable in this case, there's very few exceptions to this general proposition. One exception is in the case of fraud, because it goes through the formation of a contract. So we're going to suggest, as we did in our briefs, that the exceptions that apply to this general rule are only when a contract doesn't exist. Say it was fraudulently entered into, rescinded, et cetera, or when there's performance outside the scope of the contract. In this case, it's one of those cases that comes up with so many little frills and compartments and inconsistencies and innuendos. The long and short of it is there was funding of $500,000 that basically appeared to be turned back funding and allocated. But there were suggestions of fraud and misrepresentation. They were not really what was presented to the jury. As a matter of fact, even the contract in this case, I'm very surprised by the manner by which these two sophisticated business people put together a contract. In this case, it's almost unintelligible. Some of the language doesn't even have full sentences in it. But the long and short is that when Mr. Stoddard got fired, the other side called and said, I was relying on him and so forth. We're ending our deal. I want my money back. And it looked like the other side said, OK. And in the end, after all is said and done, the jury gave money back, $500,000. They allocated it. Strangely, I can tell you, strangely, they broke it up and set some against the individuals who took some of the money apparently. So there's a little bit of a justification there for other uses. And the remainder was assessed against the company. And it's down and dirty frontier justice. The question is, do you really have a serious complaint? Yes, Your Honor, we do. And I can come back to the issue of the contract in a second because the wording of the contract and some of our arguments. There's probably three. There's probably an oral arrangement with two subsidiary written documents that report to enhance it and provide for it. And we would also say that based on that oral arrangement, even though either of the two written contracts referenced others, the oral had other elements that were enforced. This all went to a jury. And you guys spent all your clients' money. And you're up here again. The question is, either there's total error going way back from the beginning or there's no error of any significance. And I don't quite know how to assess it. I'm just anxious to hear the arguments of both of you on this thing. But that's my problem. And they may not have that problem. Well, if you could address in making your presentation also, don't you have a problem with the verdict sheet you agreed to? Because you essentially allowed the award of damages. It says, if you've awarded damages against Mr. Quintero, Mr. Rosevin, and Mr. Stoddard for breach of contract, then do not consider unjust enrichment. But it doesn't preclude the jury from considering unjust enrichment. And then paragraph 5 says, Mr. Rosevin, if you find that he was unjustly enriched, then if your answer to 5 is yes, how much do you award? Why doesn't your assent to the verdict form place us in the realm of plain error? And how do you show plain error? First, Your Honor, I would – I mean, to take these kind of concerns and to go back. First, it was a fundamental issue. I understand from summary judgments not necessarily before the court. But a fundamental issue relates to the trial court that there's disparity between alleging these people are members of the contract and you can sue under the contract. And we're talking about the individuals, as well as suing under theories of unjust enrichment. But they're mutually exclusive. We made clear in both our affirmative defenses and our suggested jury instructions and verdict sheets to highlight this. What happened when you say that we assented, we objected to the jury instructions. We objected to the fact that jury instructions, A, didn't include any affirmative offenses, whether they were – But did you object to the form that Judge Keenan is pointing out? On the verdict sheet, I will go back and refresh my recollection. I don't remember any agreement to the verdict sheets. We proposed our own. Well, I didn't see any disagreement in the record. We proposed our own. And in the brief colloquy in front of the judge directly before they were, I guess, presented off to the jury, we suggested that everything was preserved for our objections. Is that sufficient to preserve your objection by offering an alternate instruction, an alternate verdict sheet? Is that your position? There was much more discussion. Under Maryland law, you can preserve your objection by simply offering an alternative? There was much more discussion about the jury instructions rather than it was about the verdict sheet. They were presented immediately before they went. The jury instructions highlighted, I think, some of our positions in terms of affirmative offenses. And just as a general matter, there were no affirmative offenses included, even though the other side suggested affirmative offenses. So those appeared in both, but we would suggest it was clear error for the trial court because what happened once the counterclaim was dismissed, we believe that he just truncated the section of the jury instructions and didn't provide anything following. Well, you know, every time signs are proposed in jury instructions, there's give and take, there's discussion back and forth between the lawyers and the judge, and then the judge finally decides on something. After he had done that, didn't you indicate your satisfaction with his jury charge in this area? Your Honor, if you look at the colloquy that went back and forth between the counsel, we submitted, say, a jury instruction that was this large. So that had all the general cause of action with ours, and we both departed from the standard jury instructions in this particular case. We had our own special. Then we had a section for the counterclaim. Then we had sections for affirmative offenses. All the discussion that went back and forth with the judge was on the initial section. There was no discussion on the affirmative offenses, what was going to be included, what weren't going to be included. We discussed the topics that were contained in the affirmative offenses. We discussed how important it was that the impossibility was there, how important it was frustration of purpose, how important it was the disconnect between alleging someone's a member of a contract as well as a beneficiary of an unjust enrichment. The record is clear that we discussed those issues, but we never specifically addressed whether the judge included the affirmative instructions. We just focused on the very top. We didn't know that the affirmative offenses were not included at all until they were actually given to the jury. I think both sides presented affirmative offenses, and we expected those to be included, and I think it was the judge's clerical error that he didn't get to those. But there was substantial discussion in all facets of some of the issues that we raised in our affirmative offenses, and I think both counsels were under the assumption they were going to be provided. And if I can pivot to your issue on the contract, Your Honor, we definitely agree. And one of the things that we were suggesting to the lower court, because the contract facially references an external note, because it is ambiguous in most ways. Well, that's formal. Yes, it's ambiguous, and it looks like it was taken from a form, but then more critically it says that the contract refers to borrowers and defines borrowers as the company and the two individuals jointly and separately. But then it's only signed by the corporations. In their corporate capacity, yes, Your Honor. Yeah, a total inherent inconsistency. And these are things that you present to a jury. It looks like there was a misuse of the monies. Maybe, maybe not. It looks like there were some misrepresentations. There was some suggestion that they knew Stoddard was going to be born while they were negotiating and that the delegates relied on Stoddard. These things are all innuendos, and the question is I just couldn't get a handle on what you're objecting to primarily in this case. The jury basically concluded in this overall arrangement it never got off the ground, and that fidelity was entitled to $500,000 back. And so they ordered it to be given back. I don't understand why that is one of the basic beliefs you should be addressing. Is there some fundamental wrong with that? There's two issues. One, to address this point, and then second, on the dismissal of our counterparts. On this fundamental point, we do think as a simple matter of law and violated of public policy, if you step back for a second, the overall situation is two business entities that are negotiating with each other and enter into a contract. And at the end of the day, you're allowing one business entity that didn't like how the contract went because it was a breach in performance. Except then, let's just take a little bit, take that issue factually. This is what we want in the jury. So fidelity calls up one of your representatives and says, we don't like the fact that it's out there. We count it on the fact. We want to undo it. We want our money back. We're calling it back. The other guy says, I agree. I agree. But he wants to continue the vote in another side business. They go on for quite a while agreeing that that arrangement is ended. Now, if that arrangement is ended factually by agreement and probably maybe legally justified, then they get their $500,000 back. Now, the rest of it are expectations. There was some talk about reopening side business and having new agents, new insurance companies, and so forth. You see the difficulty. I don't know where the lawyers were when the principals were talking in this case, but it seems to me. Incredibly, they weren't involved, Your Honor. Well, somebody wrote those things or tried to. Briefly to focus on the fundamental issue. I don't even have a response to that. We're not here to fight. Briefly to focus on the fundamental question that you're raising is if you look from a public policy perspective, I had a big picture. Two sophisticated business entities were negotiating. There was a contract. The contract was breached. One of those entities is now trying to recover not just against the other business entity it entered into a relationship with, but one of a corporate officer or shareholder because the only representative capacity. Wasn't there some evidence that the money went to those officers? Your Honor, as a matter of law, unjust enrichment can't be pursued if you open it up and you say we sued. You say it can't be pursued if you're in a contract, but are you taking the position the individuals are parties to the contract? No, Your Honor. I'm saying you start with that basic proposition. If they were parties to the contract, then you can't pursue unjust enrichment. Let's assume they were not parties to the contract. If they are not parties to the contract and they're incidental beneficiaries. Not incidental. They just happened to be getting a misuse of the money. The money was intended to fund the development of the business. And there's clear evidence that some of that money didn't go there. And, Your Honor, not disputing the fact, the evidence, evidentiary issue, but just on that narrow issue, if you're a recipient of a benefit, incidental or otherwise, of a performance from an express contract between two other parties, you're a third party that receives benefit. Except you happen to be the principal of the corporation, and you're funding yourself. Unless you enticed that, and there's no funding. My money enticed it, the order did. They represented, in their capacities, they represented the business entities. They represented the business entities, but they also had individual interests. They were the business entities. Weren't there only two? Your Honor, I see the amount of time. But my point is, your principles, your hard and fast principles may be absolutely true, but they don't fit the case. The case is so intensely factual that there could have been 3,000 ways for the jury to come to a conclusion. But the long and short is, there were no damages in this case. There was basically a return of the funding, which had never been used. Two days afterwards, three days after the contract, it was handed, and the money was ordered returned. Your Honor, if I could, briefly. Go ahead. I probably have a shred of time. So factually, I think the record reflects that the contract was called back seven to eight weeks afterwards. For what? For two, the agreement between the parties also anticipated, because it was spinning up a new business, that expenditures would occur even before they were transferred. So there was a little bit of payback. Third, just to be very clear, the record does not reflect any direct benefit whatsoever to Mr. Resettles. So there were allegations that some companies he was associated with received payment, whether for services rendered or otherwise, but he received no salary, no indirect benefit, no stock options, no dividends, no tangible benefit whatsoever. Just to address your brief factual issues. Thank you, sir. I'm happy continuing, but I— I wish I understood the facts a little better. I'm sure the jury—how long was the trial? The trial was about four days, Your Honor. Four days. The jury was up briefly before asking questions, but I believe it was only one day and then recessed before the next, before they came back with the full verdict. Would you be standing here if the jury had awarded $500,000 to Fidelity and no on Justin Richmond? To Fidelity against Conterra? Yeah. No, Your Honor, we would not. Thank you. Thank you, sir. Good morning. May it please the Court, my name is Priscilla Donovan. Along with my partner, Dan Donovan, we represent Fidelity and Guarantee Life Insurance Company. And we are asking this Court to affirm the jury's verdict below and affirm all of Judge Motz's rulings below. At the heart of this case is a loan which was not paid back. And as Judge Niemeyer pointed out, Fidelity—based on the evidence presented to the jury at trial, the jury could have found, upon sufficient evidence, that Mr. Rusevans was unjustly enriched. Mr. Rusevans diverted a substantial portion of the funds to FRA, another company of which he was the sole owner, and to other companies and other entities as well. I want to address the verdict sheet question that was asked of opposing counsel. And, Your Honors, I would point out that the proposed verdict sheet that was presented by Conterra did not have the alternate arrangement of the jury awarding either damages under breach of contract or damages for unjust enrichment. There was no reference in Conterra's proposed verdict sheet that those were alternate remedies and that the jury couldn't come to a damage figure on both of those remedies. So Fidelity's verdict sheet, in contrast, made it plain and clear to the jury that if they awarded breach of contract damages, then they could not award unjust enrichment to those defendants. So we submit, Your Honor, that there was no—Your Honors, there was no abusive discretion with respect to either the verdict sheet or the jury instructions. As I—excuse me a second. As I understood his argument, is that he was surprised after having heard the jury charge that certain aspects of the law favorable to him had not been charged to the jury. But I couldn't find, in reading the transcript, any objections that were made. Am I missing something? No, Your Honor. I believe you're exactly correct. There were overall general objections to the jury instructions before they were given. And all of the colloquy with Judge Motz appears in the record with regard to the jury instructions. But there was no specific objection just before the jury instructions were given that they were incorrect or that there was an error as a matter of law. And looking at the unjust enrichment instruction in particular, if you look at the appendix at page 1,117 to 1,118, when the jury came back with its question about the definition of unjust enrichment, opposing counsel provided to Judge Motz the exact words that he wanted Judge Motz to use for that definition. And the record reflects that Judge Motz did say to the jury, unjust enrichment is simply the doctrine that a person should not be enriched or profit or enrich himself inequitably at another's expense. The measure of damages is the benefits received rather than the benefit confirmed. And moving to the question of the benefits received, there was ample evidence in the record not only with the expert's testimony but also independent evidence that the jury reviewed that Mr. Rusevans benefited from those funds. First, you have Mr. Rusevans' 2012 personal tax return where he represented to the United States government that he's the sole owner of FRA. Additionally, there was the Conterra QuickBooks records and the Conterra Profit and Loss records. Now, the Conterra check ledger, which was presented to the jury and testified to by several witnesses, including Conterra's bookkeeper, showed that $172,000 going to FRA the day after the $500,000 loan is given by Fidelity. And although Conterra's witnesses testified that that was somehow a repayment of expenses that FRA had fronted, there is not a single document in evidence that shows what that payment of $172,000 was for. And opposing counsel refers to invoices and he chastises Fidelity's expert for not reviewing invoices, yet not a single invoice is presented at trial as evidence to the jury of what those payments were for. So we submit to Your Honor that the jury had sufficient evidence on which they could find that Mr. Rusevans benefited from the funds. With respect to whether the Rule 50 motions were properly decided, on both sides of the question we think Judge Motz decided the issues appropriately. First of all, for Mr. Rusevans' argument that his motion for judgment as a matter of law for the claims against him should have been granted, that was not preserved for appeal. There was no objection at the time of the ruling. Also, there was no plain error because the jury did not render a verdict against Mr. Rusevans on either of those claims, on breach of contract or on fraud. With respect to the counterclaims, Fidelity submits that there was insufficient evidence as a matter of law under which the jury could have found Horkin Terra. On the breach of contract claim, the contract, despite what people say about it, is very clear at paragraph 1A that Fidelity had the right to demand repayment. 1A refers to it. I think 1F is the one you have to rely on. That's correct, Your Honor. And in the amended complaint, we did allege that Fidelity had two grounds for calling for repayment of the loan. One is under 1A where we could accelerate payment of loan. Well, you don't need 1F, and it's not totally clear, but if the relationship ends, they can call for another. That's correct, Your Honor. 1F refers to the producer agreement, which is attached to the amended complaint as an exhibit. And that is a standard agreement that Fidelity has with all of its agents, and it allows either side to terminate on 30 days' notice. Their argument, I suppose, is that it hadn't been terminated when he called it because they terminated it later. But in the telephone calls and the e-mails, you guys didn't attach the e-mails, did you? We did not attach the e-mails between Mr. Phelps and Mr. Rusevitz in the record. I kept looking for the e-mails in the record. It was in the record, but they were not in the record. Well, if you look at the record and look at the testimony, Your Honor, some of those e-mails were read into the record. That's the only way I got to them. They testified, they read them, but it would be good to see the e-mail stream. But regardless, it looked to me like everything was terminated in those e-mails and telephone discussions between the parties with agreement and no objection. That's correct. They were trying to keep a relationship between them, and it looked to me like they agreed it ended. The formalities of taking, I don't know why he said he relied on the 30-day thing, because it consisted with our telephone conversations or e-mails. We're formally terminating them exclusively. But regardless, all of that was done a lot earlier than the mechanics of character. It's not an independent note. In this case, it's really a note in connection with a financing arrangement for parties going into business together. And it seemed to me the note would have been forgiven had the business been a success and there were contingencies when it would come back. One of them was if the relationship ended. Yes, if you look in the record, the development loan agreement appears at page 35 of the appendix. And you're right, Your Honor, that the loan might have been forgiven if certain production levels had been reached. With respect to Kintera's argument that Fidelity somehow made performance impossible, we disagree. It was apparent from the record that Kintera had another funding opportunity available to it from National Life of Vermont, and Kintera never expected to just sell Fidelity's products. They would have sold products of other insurance companies as well. With regard to the funding opportunity they had from National Life of Vermont, Mr. Rose-Evans made a decision to send that funding opportunity on to FRA and not to keep going with Kintera. And we think, Your Honor, that the testimony of Mr. Stout, who was Kintera's own consultant and also the former CEO of Fidelity, is very important. So the entire Stout deposition transcript is an ECF document in the district court below. It's 142-5, and Mr. Stout testified that Kintera failed for a number of reasons, not just because of Fidelity's actions in calling for repayment of loan, but because Mr. Stoddard was fired so they couldn't proceed with the marketing materials. Mr. Stoddard had run off with the URL and the domain rights, and also because Mr. Rose-Evans made a conscious decision to shut down Kintera and go get his other business up and running again, FRA. So the benefits did accrue to Mr. Rose-Evans. I want to address briefly the public policy argument that opposing counsel raises, and Fidelity disagrees that the jury's verdict has any effect or impact on public policy. The jury did not find Mr. Rose-Evans owed the money because he was an officer of a corporation. Instead, the jury found that Mr. Rose-Evans was unjustly enriched because of the flow of funds and that it would be inequitable and unfair for him to keep that money. So it doesn't mean that any corporate officer is going to be liable for corporate debt, and that we believe that that argument is really not ñ it's a red herring. It shouldn't be considered by this court, or if it is considered, it doesn't render overturning the jury's verdict. With respect to the expert testimony, it's clear from the record that there was no objection to the denial of the motion in limine, and there was no objection to the substantive testimony once the expert was on the stand giving testimony. So for Kintera to claim now that that was an error we believe is not correct, and under an abuse of discretion standard, Judge Motz's decision to allow that testimony to go forward should not be overturned. With respect to the jury instructions as a whole, as I said there was discussion among counsel and Judge Motz about the jury instructions, and although Kintera maintains that Judge Motz made a ruling on the jury instructions while not reading the provisions, that's not supported by the record, and honestly I find that suggestion disrespectful to Judge Motz. And with regard to the restatement of restitution, Maryland has not adopted restatement of restitution section 110, so we do not urge an overturning of the verdict as Kintera does on that basis either. In fact, that particular restatement of restitution really deals with third-party beneficiary argument, and neither side was making an argument about third-party beneficiary in this case. Instead, Fidelity argued that Mr. Rusevans and Mr. Stoddard benefited from the flow of the loan proceeds and used it for their own purposes instead of using it for the success of Kintera. On the tortious interference claim that was denied by Judge Motz and that Judge Motz ruled on as a matter of law, we submit that there was insufficient evidence for which the jury could have found for Kintera. There was absolutely no evidence in the record of any damages that Kintera suffered. There was no monetary amount ever spoken by any of Kintera's witnesses. And also, if you look at the testimony of Mr. Stout, which I referenced earlier, Mr. Stout indicated that that preliminary arrangement, which was discussed with Hegemon and Hubert Humphrey, would not have been profitable for Kintera. In fact, Mr. Humphrey kept negotiating, and he was expecting that 95 percent of the compensation would accrue to him instead of Kintera. So Mr. Stout viewed that as a money-losing opportunity for Kintera, or as in his words he called it, not an opportunity that would have enabled Kintera to succeed. In other words, a low-margin business. So we submit that there was not legally sufficient evidence on which that claim could have gone to the jury. And on the breach of contract claim, that should also not have gone to the jury that Fidelity breached the development loan agreement, because Fidelity had the unambiguous right to call the loan either under 1A or under paragraph 1F, as Your Honor points out. And additionally, Mr. Phelps did not act wrongfully. So Mr. Phelps of Fidelity testified that he never told Mr. Evans to stop negotiating another deal, and he never told the other party to stop negotiating with Mr. Evans. So there was no wrongful action on Fidelity, by Fidelity, throughout the case. Kintera hasn't cited any binding authority which would require this court to overturn the jury's verdict. Many of the cases cited by Kintera are either unpublished, or they deal with the case at a different phase, either a motion to dismiss phase or a summary judgment phase. And so we submit that Kintera has not provided this court with authority on which you can overturn the unjust enrichment verdict. With respect to the issue of the express contract and whether that precludes unjust enrichment, there are two reasons why the contract doesn't preclude unjust enrichment in this case. The first is that the contract, as Judge Niemeyer pointed out, does not cover the entire scope of the party's arrangement. There were other – there was the producer agreement. There were other letters regarding compensation. So this contract did not govern the entire scope of the party's relationship. And although Fidelity does not concede this and does not admit this if the case is sent back for retrial, one could infer that the jury found that Mr. Rusevans was not a party to the development loan agreement, and therefore they were entitled to move on to the unjust enrichment claim against him. He didn't sign it in his personal capacity. The signatures at the end are just on behalf of the entities, right? That's correct, Your Honor, but the evidence in the record that was presented to the jury showed that Mr. Rusevans and Mr. Stoddard exchanged e-mails before they signed the development loan agreement where they acknowledged that the intent was that they would be personally liable. And that was also a subject of admissions, which was – Isn't that a strange way to conduct business is they agree they're going to be personally liable, but then they sign a note on behalf of the companies and there's no guarantee provided in there, individual guarantees. There is that statement that says they're jointly and separately defined to be a borrower, which is sort of inconsistent with the signatures, but these are all inconsistencies which we can't deal with as an appellate court. They have to be handled by a partner. That's correct, Your Honor, and we believe that the jury came to the right conclusion on the facts and that Judge Motz ruled correctly on the law with respect to all of the issues before him. All right, thank you. Thank you. Mrs. Swafford. Thank you, Your Honor. Briefly to go back through the issues, starting with the counterclaim, the issue before this Court on the two problems of the counterclaim that were dismissed was whether there was any sufficient evidence to go through to the jury rather than be dismissed completely by the trial. So on the issue of the counterclaim alleging breach of contract, Your Honor points out suggesting that they had alternative basis between 1A and 1F. First, the trial court only dealt with 1A and found that they had an absolute right under 1A to call back the loan agreement. As we are going to reach, and if you look at the rest of the context of that two-page document. Well, it does allude to the right to accelerate, but the conditions for acceleration are absolutely other contracts. Exactly, Your Honor. But they had a right to accelerate, so what's your objection? Our suggestion is that 1A only says the contract can be accelerated. And then if you have to look at the other terms under the contract to see under the conditions, none of the other terms except for 1F potentially apply. So first, judges didn't get to 1F. So what's 1F? Second, 1F, the producer agreement was only terminated well after the loan was called back. No, it was terminated much earlier. It was terminated within, the whole thing was terminated. You look at the emails and telephone discussions. The producer agreement, that was just a formal follow-up to terminate that, but the arrangement was terminated. And the whole financing, $500,000, was being called back because the whole arrangement was ending. Your Honor, I think the context is important. So producer agreement provides the agency ability to sell, can sell Fidelity Guaranteed products, and that's how they generate revenue. I don't think any of the emails that were exchanged earlier talked about ending that condition. Well, it's part of the overall arrangement. Your Honor, our suggestion is, or our supposition based on the record, is that those emails that came before the formal termination only talked about returning the investment, that it still was contemplated by the parties that would continue to sell the products. That only happened much afterwards, after counsel got involved. Segueing on, Your Honor, to the second issue of the counterclaim on torture interference. The trial judge premised his ruling really on whether damages were too potentially speculative or the deal was too potentially speculative. If you look at Maryland law, it's very clear. He basically said no damages, no damages, no, no, no, no. Which, and our point, Your Honor, is very simple. That lost profits, as opposed to other jurisdictions like New York. There's no evidence in there of any numbers. Lost profits are available for a new startup entity as a matter of law in Maryland if you show with a reasonable certainty that you have an expectation of profits. What was your profit number that you were denied? Your Honor, if you look at the pro forma and as well as the business plan. What dollar amount did you ask for? Well, Your Honor, it never got through to the jury, so we didn't have the opportunity. We had clear testimony that the pro forma and the business plan were reliable projections for profit and loss for the first two to three years. Their side even agreed in testimony. There was no evidence that that could be realizable. Your Honor, they even agreed that they were reasonable projections for the first two to three years. If you have a reasonable business plan that projects for two to three years out what your profit and loss is and the contract is canceled, there was no discussion that those projections weren't reasonable. They provided the basis for the jury to say, well, the contract was canceled. The other side called in and didn't have a right to. They could have assigned a particular number from one year or two years based on the projections. To quickly address some of the other things, opposing counsel suggested that the 2012 tax returns on one of the individuals actually showed a benefit. Your Honor, it showed that he had ownership of FRA, but he didn't receive any dividends. He didn't receive any salary from that company, and the record is quite clear. He received no direct benefit whatsoever. We understand that sufficiency. It troubles me the way you're making these statements. $500,000 comes in, and a few days later, a check for $172,000 is written to his company that he wholly owned, FRA. Your Honor, if you back up. He orchestrates that. Now, can't the jury conclude that he is the beneficiary of that? Your Honor, for one, the record reflected two to three months before. My question is, couldn't the jury conclude that he was the beneficiary of that? Under the circumstances where there was clear evidence, invoices, and others, the assumption of the parties and the recognition of the parties was that Mr. Roosevelt's company, because Cantera was a startup, was going to pay a lot of expenses and help set up the infrastructure until they received funding. Both parties recognized that. They understood that was the arrangement. Mr. Roosevelt's company did so, and there are invoices and testimonies supporting the default marketers. There is no evidence to support that $172,000 payment to FRA. Yes, Your Honor. In the discussion back and forth with his accountant, with Ms. Tricia Young, there were discussions of how much of that for the preceding three or four months had actually been used as outlays for FRA. If you look at the amount and then the invoices and the testimony in QuickBooks, so QuickBooks, it was a snapshot. $172,000 comes in, say, October 1st. If you look at the expenses that went out before that, they're the exact same amount. The funds were transferred to FRA. Those expenses weren't incurred for this particular arrangement, were they? Yes, Your Honor, in anticipation of performance. Cantera started expending the funds through FRA. I think these are all factual questions that you had a chance to argue. And we did, Your Honor. Cantera obviously thought that he was benefiting himself by writing that check. Fidelio thought it was going to stay with the business entity, and that was what was needed in terms of funding the business entity. It was basically a capitalization of enterprise, a joint venture or something. Yes, Your Honor, we agree. It was a capitalization of a joint venture. Capitalization would have remained capitalization. It never happened to pay it back. If it got off the ground, if it did not get off the ground, they'd have to pay it back. But I don't think they anticipated that then. Cantera would immediately transmit that check now to private investors in their own interest. Understanding your point, Your Honor, the issue that we'd like to make factually is that there was more than sufficient evidence to support that any transfers that happened back and forth were to cover invoices for third parties, not as profit as first. So there was no suggestion that any of it was profit as first, and so it went to FRA, much less to Mr. Resetman's person. To finally address some of the other issues, Your Honor, the big picture for us on public policy is, as they point out, you have a person that's either a corporate officer or a shareholder of a business entity. In the absence of fraud, you've allowed a personal recovery against him. As a proposition for longstanding law in Maryland, if you don't affirmatively say that you're personally liable under a contract, if you don't affirmatively say that you're signing a personal guarantee, so leaving all that aside, you cannot recover against an individual on the basis of corporate officer or shareholder in the absence of fraud. Maryland law is quite clear. They addressed the issue very recently, trying to decide whether paramount equity was still available, but they came down and said to pierce the veil and to go through to personal assets of a corporate officer or corporate shareholder, there must be fraud. In this case, there was none. Thank you, Your Honor. Thank you. We'll come down to meet counsel and then proceed on the last case.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Barbara Milano Keenan